IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BONNIE K.,[1] | ) |
| | ) |
|     Plaintiff, | ) |
| | ) No. 20 C 4778 |
|     v. | ) |
| | ) Magistrate Judge Beth W. Jantz |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of Social Security,[2] | ) |
| | ) |
|     Defendant. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Bonnie K.'s application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). For the reasons that follow, Plaintiff's motion for summary judgment [dkt. 17, Pl.'s Mot.] is denied, and the Commissioner's cross-motion for summary judgment [dkt. 20, Def.'s Mot.] is granted. The Court affirms the Commissioner's final decision.

---

[1] In accordance with Internal Operating Procedure 22, Privacy in Social Security Opinions, the Court refers to Plaintiff by her first name and the first initial of her last name.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi has been substituted for her predecessor.

**BACKGROUND**

I.  **Procedural History**

On November 1, 2017, Plaintiff filed a claim for DIB and SSI, alleging disability since March 16, 2015, due to low vision, COPD, depression, sleep apnea, congestive heart failure, and glaucoma. [Dkt. 16-1, R. 261-73, 294.] Plaintiff's claim was denied initially and again upon reconsideration. [R. 131-32, 167-68.] Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 26, 2019. [R. 59-102.] Plaintiff personally appeared and testified at the hearing and was represented by counsel. [R. 61, 66-93.] Vocational expert ("VE") Monica Dabrowiecka also testified. [R. 94-100.] On September 3, 2019, the ALJ denied Plaintiff's claim for benefits, finding her not disabled under the Social Security Act. [R. 38-51.] The Social Security Administration Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. [R. 1-3.]

II. **The ALJ's Decision**

The ALJ analyzed Plaintiff's claim in accordance with the Social Security Administration's five-step sequential evaluation process. [R. 38-51.] The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her amended alleged onset date of September 1, 2016. [R. 40.] At step two, the ALJ concluded that Plaintiff had the following severe impairments: congestive heart failure ("CHF"), chronic obstructive pulmonary disease ("COPD"), obesity, left eye glaucoma, and obstructive sleep apnea. [R. 40-42.] The ALJ also determined that Plaintiff's right knee injury, major depressive disorder, and generalized anxiety disorder were non-severe impairments. [*Id.*] The ALJ concluded at step three that her impairments, alone or in combination, do not meet or medically equal one of the Social Security Administration's listings of impairments (a "Listing"). [R. 42-43.] Before step four, the ALJ

determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following additional limitations: she cannot climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; she cannot work around hazards such as unprotected heights and exposed moving mechanical parts; she cannot drive a motor vehicle; she cannot tolerate more than occasional exposure to extreme cold or extreme heat, fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants; she does not have peripheral vision on her left side; and work should involve simple instructions, routine tasks, occasional changes in the workplace setting, no public interaction, and occasional interaction with supervisors and coworkers. [R. 43-49.] At step four, the ALJ concluded that Plaintiff would be unable to perform her past relevant work. [R. 49.] At step five, based upon the VE's testimony and Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff could perform jobs existing in significant numbers in the national economy, leading to a finding that she is not disabled under the Social Security Act. [R. 50-51.]

## DISCUSSION

### I.  Judicial Review

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a five-step inquiry, asking whether: (1) the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any listed

3

impairment; (4) the claimant retains the RFC to perform her past relevant work; and (5) the claimant is able to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 416.920(a). "A finding of disability requires an affirmative answer at either step three or step five." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). "The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." *Id*.

Because the Appeals Council denied review, the ALJ's decision became the final decision of the Commissioner and is reviewable by this Court. 42 U.S.C. § 405(g); *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). The Court plays an "extremely limited" role in reviewing the ALJ's decision. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation omitted). "To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses." *Beardsley v. Colvin*, 758 F.3d 834, 836-37 (7th Cir. 2014). While this review is deferential, "it is not intended to be a rubber-stamp" on the ALJ's decision. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). The Court will reverse the ALJ's finding "if it is not supported by substantial evidence or if it is the result of an error of law." *Id*. at 327.

The ALJ has a basic obligation both to develop a full and fair record and to "build an accurate and logical bridge between the evidence and the result [so as] to afford the claimant

4

meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837. Although the ALJ is not required to mention every piece of evidence in the record, the ALJ's analysis "must provide some glimpse into the reasoning behind [his] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001); *accord Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). The ALJ "must explain [the ALJ's] analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) (quoting *Briscoe*, 425 F.3d at 351). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

## II. Analysis

Plaintiff argues that the ALJ (1) failed to adequately develop the record and seek a medical expert opinion regarding her knee injury, (2) improperly gave his own lay opinion in determining that her knee injury was not severe, and (3) did not properly assess her subjective complaints. [Dkt. 17, Pl.'s Mem. at 3-16; dkt. 22, Pl.'s Reply at 1-5.] The Commissioner argues in opposition that the ALJ reasonably concluded that Plaintiff's knee injury was not a severe impairment, the ALJ had no obligation to obtain further evidence regarding Plaintiff's knee injury, and the ALJ appropriately assessed Plaintiff's subjective statements. [Dkt. 21, Def.'s Mem. at 2-12.] For the reasons that follow, the Court affirms the ALJ's decision.

### A. Plaintiff's Knee Injury

Plaintiff first argues that the ALJ should have developed the record and obtained a medical opinion regarding Plaintiff's knee impairment and its effects on her functioning. [Pl.'s Mem. at 3-7; Pl.'s Reply at 1-3.] Plaintiff further maintains that the ALJ erred at step two in finding her knee injury not severe and thus not considering it when crafting her RFC. [*Id.*]

5

The Court concludes, however, that, based on the record before him, the ALJ's decisions—both not to seek further evidence and to find Plaintiff's knee injury not severe—were sound.

The medical evidence in the record reflects treatment for Plaintiff's knee injury only from August to November 2018, as follows. On August 1, 2018, Plaintiff first went to a medical provider, complaining of right knee pain and swelling. [R. 1106-07.] Upon exam, she had decreased range of motion due to pain and stiffness in her right knee, swelling, effusion, and tenderness. [R. 1107.] Plaintiff was referred to orthopedics, told to use an ace bandage wrap to help with swelling, and advised to elevate her leg at home. [R. 1108.] On August 11, Plaintiff went to the emergency room for knee pain and swelling, reporting that she had twisted her right knee two weeks prior. [R. 1556.] She again had limited range of motion, swelling, effusion, and tenderness. [R. 1557.] An x-ray of her right knee revealed no evidence of dislocation, but she did have a "small to moderate suprapatellar effusion" and a "suggestion of lateral notch sign." [R. 1558.] Plaintiff was given a knee immobilizer, crutches, and a prescription for ibuprofen (she already had a prescription for a narcotic, Norco), and she was advised that she might need an MRI to evaluate her cruciate ligaments. [R. 1558-59.] Two days later, on August 13, Plaintiff was seen by a primary care doctor for her knee injury, and she reported pain severity of "10/10." [R. 983.] A physical examination revealed decreased range of motion, swelling, effusion, tenderness, and edema. [R. 984.] The doctor prescribed a medication for swelling and advised Plaintiff to return in one month or if symptoms did not improve. [R. 985, 990.]

Next, Plaintiff went to the emergency room for her knee pain on October 14. [R. 1618.] Upon exam, she had a "moderate suprapatellar knee effusion" and mild tenderness but full range of motion. [R. 1620.] Plaintiff did not want repeat imaging of her knee and instead asked for and obtained a new knee immobilizer and orthopedic referral. [R. 1620, 1631, 1646.] On

6

October 25, Plaintiff followed up with the orthopedist, walked with crutches while there, and reported experiencing "persistent swelling, locking, and catching with occasional buckling sensation" in her right knee. [R. 1328-31.] The physical exam revealed "severe effusion," tenderness, limited range of motion, crepitus, and a positive Lachman test. [R. 1330.] She was referred for an MRI of her right knee, which she had on November 9. [R. 1331-34.] The MRI revealed, among other findings, "large volume knee joint effusion and associated synovitis," "diffuse edema throughout the soft tissues circumferentially above the knee," "underlying tricompartmental degenerative joint disease which is at least mild in severity," diffuse thinning of cartilage with diffuse grade two to three chondromalacia changes, a high-grade MCL injury at least grade two in severity, and a grade one to two LCL sprain. [R. 1034-35.] Plaintiff's last visit for her knee was to the orthopedist on November 20, 2018. [R. 1326-28.] At that time, she again used crutches to walk, and the physical exam findings were the same as in her late October visit. [R. 1328.] The orthopedist reviewed the MRI findings and recommended using a hinged knee brace, attending physical therapy, and taking anti-inflammatory medications; if symptoms persisted, he suggested that they would discuss surgical options with a specific doctor. [*Id.*]

After November 20, 2018, the only other mention of a knee condition in the medical records was during Plaintiff's hospitalization for chest pain in March 2019, when she generally reported that she had chronic knee pain that interfered with her daily activities. [R. 1442, 1467.] At the administrative hearing, when Plaintiff's attorney asked her about her "issues with [her] right knee," Plaintiff responded that the condition "was in August." [R. 81.] When asked what happened since then, Plaintiff testified that when they did the MRI, they found that her knee "is ate up with arthritis." [*Id.*] Plaintiff also testified that she had "knee pain a lot" and cannot climb stairs in part because of her knee pain. [R. 81, 91.]

7

Citing the medical records summarized above, the ALJ concluded that Plaintiff's MCL/LCL knee injury was not severe because it did not last at least 12 continuous months as required under the regulations, *see* 20 C.F.R. § 404.1509. [R. 41.] The ALJ noted that the condition was "reflected in only three to four months of treatment notes, from August to November 2018 [ ], after which clinical abnormalities no longer appear." [*Id.*] Additionally, the ALJ recognized that the record showed that Plaintiff walked with a normal gait and did so even while being treated for her knee injury. [R. 41 (citing, *e.g.*, R. 1454, 1470, 1489, 1830).]

Turning first to Plaintiff's argument that the ALJ was required to obtain more medical evidence to develop the severity of Plaintiff's knee impairment, "a claimant represented by counsel is presumed to have made his best case before the ALJ." *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). It is Plaintiff's obligation to prove that she is disabled, including by submitting "all evidence known to [her] that relates to whether or not [she is] disabled." 20 C.F.R. § 404.1512(a). The ALJ does, however, have a duty to develop a "full and fair record," but that duty is not endless, and the Court will ordinarily defer to the ALJ's reasoned judgment about how much evidence to gather. *Thomas v. Colvin*, 745 F.3d 802, 807-08 (7th Cir. 2014) (quoting *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000)); *see also Migdalia M. v. Saul*, 414 F. Supp. 3d 1126, 1136 (N.D. Ill. 2019).

Here, the ALJ reasonably concluded that he had sufficient evidence to evaluate Plaintiff's knee injury. Plaintiff's presentation of her complaints about her knee injury and lingering knee pain before the ALJ were extremely limited: she mentioned "knee pain" twice briefly during her testimony at the hearing and never highlighted the issue as one requiring further development, including by requesting an additional consultative examination. [*See* R. 62-66, 81, 91, 101.] This limited presentation undermines her current assertion that her knee impairment was critical

8

enough to determining her RFC that it mandated further development. *See, e.g., Migdalia M.*, 414 F. Supp. 3d at 1137.

Further, an ALJ has discretion to order a consultative examination if the evidence is inconsistent or insufficient to make a determination on a plaintiff's claim. *Skinner*, 478 F.3d at 844; 20 C.F.R. § 404.1519a(b). "[A]n ALJ must consult with an expert only when, ***in the ALJ's opinion***, the new evidence might cause an initial medical opinion to change." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (emphasis added). Given Plaintiff's limited complaints and the limited treatment records, the ALJ's implicit conclusion that the evidence of Plaintiff's knee impairment was sufficient to render a decision was a reasonable one. Following the last treatment record in November 2018, Plaintiff did not seek further treatment for any knee condition and only mentioned "chronic knee pain" once to providers in the ensuing seven months, despite having sought treatment for other medical conditions during this time. [R. 1442, 1467.] And as the ALJ noted too, there were no reported abnormalities with Plaintiff's gait after November 2018. [R. 41.] Lastly, even Plaintiff referred to her MCL/LCL injury in the past tense when testifying, instead attributing her "knee pain" to arthritis—a condition for which she did not seek treatment. [R. 81.] The ALJ's decision not to follow up on an injury that the lack of records and subjective complaints reflected had been resolved was reasonable. *See, e.g., Phillips v. Astrue*, 601 F. Supp. 2d 1020, 1032 (N.D. Ill. 2009); *Mitchel A. v. Saul*, No. 19 CV 1757, 2020 WL 2324425, at *6 (N.D. Ill. May 11, 2020).

Finally, Plaintiff characterizes the ALJ's decision as "play[ing] doctor," meaning foregoing obtaining necessary medical opinion evidence and improperly interpreting "'new and potentially decisive evidence'"—the November 2018 MRI—on his own. [Pl.'s Mem. at 6 (quoting *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018)).] But this is inaccurate.

9

Although the state agency physicians rendered their administrative medical findings before Plaintiff's knee treatment was completed, including before the MRI was taken, and no other medical opinion evidence evaluated Plaintiff's knee condition, it does not follow that the ALJ could not review the later treatment records to draw his own conclusions about the severity of Plaintiff's condition. [R. 141-42, 145-47.] This did not amount to the ALJ interpreting the raw MRI data himself, as Plaintiff asserts; instead, the ALJ had the benefit of the treating medical professional's November 20 review of the MRI results and the treatment recommendations that followed. [*See* R. 1326-28.] In any event, there is no indication that the ALJ relied on the MRI report's conclusions to determine the severity of Plaintiff's injury. *Cf. McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) ("An ALJ may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about her impairments."). Rather, the ALJ focused on the overall lack of treatment records even after Plaintiff had obtained the MRI results and the lack of reported abnormalities after November 2018 as an indicator that Plaintiff's condition was not severe. [*See* R. 41.] The Court finds nothing improper about the ALJ's consideration of the record evidence here.

Moving on to the ALJ's step two determination, the ALJ must determine at that step whether Plaintiff suffers from any medically determinable impairments that are "severe," meaning they significantly limit Plaintiff's ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1522(a). Plaintiff bears the burden to prove that the impairment is severe. *Castille v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). The ALJ concluded that Plaintiff did suffer from several severe impairments—CHF, COPD, obesity, left eye glaucoma, and obstructive sleep apnea—but that Plaintiff's knee injury did not constitute a severe impairment. [R. 40-42.]

10

The ALJ's reasons for finding Plaintiff's knee injury not to be severe were valid. The ALJ correctly pointed out that the medical record is devoid of treatment outside of August to November 2018 for Plaintiff's knee condition. [*See* R. 41.] Plaintiff herself described her MCL/LCL injury as a past condition during her testimony, characterizing her ongoing knee issues as related to arthritis instead. [R. 81.] And Plaintiff has not identified any treatment she received for knee pain, arthritic or otherwise, after November 2018. [*See* Pl.'s Mem. at 3-7; Pl.'s Reply at 1-3.] Thus, the ALJ appropriately found her knee injury to be temporary and not severe on this basis, as it is rational to assume a condition for which Plaintiff did not seek further treatment for nearly seven months afterward (measured from the late November 2018 visit to the hearing in late June 2019) had largely improved.

Additionally, the ALJ reasonably found that Plaintiff's knee injury did not significantly impact her ability to work overall, specifically her ability to walk. [R. 41.] The ALJ noted that the medical records reflected that Plaintiff had normal gait, "even during" the treatment period for her knee condition. [*Id.*] To undermine that she walked with a normal gait, Plaintiff points to contrary evidence that she sometimes used crutches during treatment for her MCL/LCL injury. [Pl.'s Mem. at 6.] But both are true: Plaintiff had occasions from August to November 2018 where she was reported to use crutches to walk and occasions where her gait was reported as normal in the medical records. [*See* R. 1328 (crutches on 11/20/18), 1330 (crutches on 10/25/18); R. 1235 (normal gait on 10/17/18), 1830 (normal gait on 9/6/18).] Even assuming that the ALJ should have acknowledged that the evidence during treatment was mixed, nothing undermines his broader conclusion, however, that Plaintiff otherwise walked with a normal gait after the treatment for her knee ended in November 2018. [R. 41; *see, e.g.,* R. 700, 707, 913, 1454, 1470, 1489.] The lack of reported abnormalities with Plaintiff's gait after treatment

11

provides support for the ALJ's conclusion that Plaintiff's knee condition was not severe because it shows that the injury only temporarily affected her physical capabilities. Accordingly, the ALJ's conclusion that Plaintiff's knee injury was not severe is supported by substantial evidence.

In any event, "[s]tep two is merely a threshold inquiry; so long as one of the claimant's limitations is found to be severe, error at that step is harmless." *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019). The ALJ must go on to consider all of Plaintiff's impairments, severe and non-severe, in crafting the RFC. *Id*. Here, having concluded that Plaintiff's knee impairment resolved, the ALJ reasonably considered the injury's lack of impact on Plaintiff's ability to perform light work with additional limitations, specifically on her ability to walk. [*See* R. 41, 45-49.] And the ALJ gave a thorough analysis of Plaintiff's other impairments that more significantly impacted her ability to work. [*See* R. 45-49.] Although Plaintiff generally faults the ALJ for not incorporating in the RFC limitations that her knee impairment caused, Plaintiff does not explain what the ALJ overlooked or what further RFC limitations were warranted, [Pl.'s Mem. at 7]. *Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *7 (N.D. Ill. Jan 17, 2012) (failure to discuss medical issues not error where plaintiff did not identify any evidence that those issues interfered with his ability to work).

Overall, the ALJ reasonably concluded that he had sufficient evidence with which to evaluate Plaintiff's knee injury. And the ALJ then appropriately determined that the knee injury ultimately was not severe based on the totality of the evidence.

### B. Plaintiff's Subjective Statements

In evaluating Plaintiff's reports of her symptoms, in addition to the objective medical evidence, the ALJ may also consider Plaintiff's daily activities, intensity of pain and other symptoms, precipitating and aggravating factors, medications and their side effects, treatment

12

received, and any other measures used to relieve symptoms. 20 C.F.R. § 404.1529(c)(1-3). The Court will overturn the ALJ's evaluation of Plaintiff's subjective statements only if it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). The ALJ must give "specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *see Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (explaining that patently wrong "means that the decision lacks any explanation or support"). Indeed, "an ALJ's adequate discussion of the issues need not contain a complete written evaluation of every piece of evidence." *Pepper*, 712 F.3d at 362 (internal quotation omitted).

Plaintiff challenges the ALJ's evaluation of her subjective complaints, contending that the ALJ's rejection of them as partially inconsistent with her activities and with the medical record was erroneous and insufficient. [Pl.'s Mem. at 7-16; Pl.'s Reply at 4-5.] Ultimately, and particularly given the deferential standard, the Court finds that the ALJ gave sufficient reasons to support his conclusion that Plaintiff's subjective reports were "not entirely consistent" with the record. [R. 45.]

To evaluate Plaintiff's alleged symptoms, the ALJ first recounted her subjective reports, which included "shortness of breath" as well as "difficulty standing more than five minutes, walking more than 50 feet/a half block, sitting, lifting more than a gallon of milk, squatting, bending, reaching, kneeling, talking, climbing stairs, seeing, completing tasks, concentrating, and getting along with others." [R. 44.] The ALJ then summarized how Plaintiff performed her daily activities, including that she mostly sat around with her feet up, but she can prepare simple meals; she can do laundry and cleaning but it takes longer than it used to; she goes out three to four times a week, usually with her daughter; and she goes grocery shopping for about two and a

13

half hours at a time, but she needs to stop and take breaks and she cannot push the cart the whole time. [*Id.*]

The ALJ ultimately found that Plaintiff's "reported activities of daily living including some household chores, going out, riding a bicycle, and more" were not consistent with the "rather extreme limitations" Plaintiff alleged or "an allegation of disability." [R. 45-46.] As the Commissioner concedes, [Def.'s Mem. at 9 n.3], the ALJ's reference to "riding a bicycle" was (to put it mildly) puzzling because there was no record evidence that Plaintiff rode a bike during the relevant period. But setting aside the erroneous, stray reference to bike riding, the rest of the ALJ's conclusion properly points to an apparent mismatch between Plaintiff's daily activities and reported symptoms. For example, Plaintiff reported performing chores such as cleaning the bathroom, making simple meals, and grocery shopping (albeit, taking longer with breaks) but also said she had difficulty standing for more than five minutes or walking more than 50 feet. [*See* R. 72, 75, 82-83, 313-15.] Equating daily activities with an ability to perform full-time work is impermissible error, but the ALJ did not do that here. *See Green v. Saul*, 781 F. App'x 522, 527 (7th Cir. 2019). Instead, the ALJ appropriately partially discounted Plaintiff's subjective reports on the ground that her daily activities were not as limited as her dire reports of her capabilities would suggest. *See Prill v. Kijakazi*, 23 F.4th 738, 748 (7th Cir. 2022); *Regina P. v. Saul*, No. 19 C 3155, 2020 WL 4349888, at *5 (N.D. Ill. Jul. 29, 2020) ("The ALJ was permitted to consider [the] mismatch between [plaintiff's] daily activities and her symptom description."). The ALJ then went on to craft an RFC that accounted for the limitations Plaintiff required, though not to the full extent to which she testified. [*See* R. 46.]

Next, Plaintiff's criticisms concerning the ALJ's reliance on the medical evidence are without merit. Plaintiff focuses on the ALJ's analysis of the objective medical evidence,

14

contending that the ALJ could not discount her symptoms solely on that basis. [Pl.'s Mem. at 10-11.] That is indeed true, but the ALJ may consider "discrepancies between the objective evidence and self-reports [because they] may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). Thus, it was proper for the ALJ to note the ways in which the objective evidence did not support Plaintiff's testimony about her condition, and the ALJ did more than simply summarize the medical evidence, as Plaintiff asserts. [Pl.'s Mem. at 10-11; Pl.'s Reply at 4-5.] Aside from the objective medical evidence, the ALJ also appropriately considered the treatment rendered, precipitating and aggravating factors of Plaintiff's symptoms, and her medications and their side effects. 20 C.F.R. § 404.1529(c)(1-3).

As to Plaintiff's congestive heart failure, the ALJ discussed the improvement shown in the record following a cardiac catheterization in March 2015, specifically that Plaintiff's left ventricular ejection fraction had improved from 20 percent to between 45 and 60 percent, most recently 45 to 50 percent in April 2019. [R. 45.] The ALJ pointed out that Plaintiff's medical providers managed her complaints of shortness of breath and chest pain through medications, and that cardiac imaging had not shown acute abnormalities. [*Id.*] The ALJ recounted Plaintiff's short trip to the emergency room in March 2019, during which her chest pain resolved after administration of sublingual nitroglycerin. [*Id.*] And, as to Plaintiff's lower extremity swelling and edema, providers had noted those issues at times, but Plaintiff nevertheless walked with a normal gait and had no reported strength deficiencies. [*Id.*]

In finding Plaintiff's subjective reports not as severe as she alleged given this evidence, the ALJ nonetheless concluded that Plaintiff had a continued reduced ejection fraction, some degree of edema at times, and some shortness of breath on exertion, and accordingly limited Plaintiff to performing light work. [R. 45-46.] Additionally, due to the shortness of breath, the

15

ALJ found that further restrictions were warranted: no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, kneeling, crouching, and crawling; and avoiding hazards like unprotected heights or exposed moving mechanical parts. [R. 46.]

The ALJ also thoroughly considered Plaintiff's history of treatment for COPD, noting that she had received regular and emergency treatment for respiratory complaints such as coughing, wheezing, rhonchi, and bronchitis. [R. 46.] The ALJ characterized the physical examination findings of rhonchi, diminished breath sounds, and wheezing to be "sporadic," recognized she had received diagnoses of COPD exacerbations and periodic bronchitis, and acknowledged too that she was prescribed inhalers and nebulizers to manage symptoms. [*Id.*] Additionally, the ALJ acknowledged that Plaintiff had gone to the emergency room about one to three times per year with COPD exacerbations and bronchitis. [*Id.*] The ALJ identified Plaintiff's smoking as an aggravating factor of her coughing, noting that she had been smoking one to two packs of cigarettes a day, although she had at the time of the hearing reduced her smoking to just one to two cigarettes a day. [R. 46-47.] Turning to the objective imaging, the ALJ explained that an August 2018 radiology study showed minimal bronchial thickening as well as moderate emphysematous changes and a CT angiogram in April 2019 showed only mild obstructive changes with the lungs otherwise clear. [R. 47.] And the ALJ specifically asserted that Plaintiff's pulmonary function tests were not consistent with the rather extreme respiratory limitations that Plaintiff alleged because they showed normal lung volumes and spirometry but with mild airway obstruction. [*Id.*]

Overall, the ALJ concluded that Plaintiff's "respiratory impairments were consistent with shortness of breath on exertion that develops from time to time particularly during an exacerbation," and that the pulmonary testing did not support more severe limitations. [*Id.*]

Thus, the ALJ accounted for the periodic wheezing, decreased breath sounds, and rhonchi found during the physical exams and the pulmonary function and radiology findings by limiting Plaintiff to light work with the same postural and environmental limitations imposed for her heart condition as well as a restriction to no more than occasional exposure to extreme cold or heat, fumes, odors, gases, poor ventilation, and other pulmonary irritants. [*Id.*]

Rather than simply summarize the medical evidence, as discussed above, the ALJ considered the relevant treatment history, physical examination findings, and objective imaging in determining the extent to which the medical record supported Plaintiff's subjective symptoms. The ALJ then properly tied the RFC to those findings. *See, e.g., Green*, 781 F. App'x at 527. To the extent that Plaintiff contends the ALJ's conclusion regarding her reported symptoms is "factually inconsistent with medical records," Plaintiff recounts entire swaths of evidence that the ALJ considered that she essentially wishes the ALJ weighed differently. [Pl.'s Mem. at 11-15.] But this amounts to nothing more than a request for the Court to "reweigh the evidence or substitute its judgment for that of the ALJ's," which it is not permitted to do. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013); *Michelle M.L. v. Kijakazi*, No. 20 C 6793, 2022 WL 3297619, at *10 (N.D. Ill. Aug. 11, 2022). Because the ALJ reasonably weighed the record evidence in determining that Plaintiff's limitations from her impairments were not as severe as she alleged, and then in ultimately concluding that her limitations warranted an RFC of light work with additional postural and environmental limitations, the ALJ's decision is supported by substantial evidence.

The ALJ's analysis of Plaintiff's subjective complaints does not have to be "perfect," it only must not be "patently wrong." *See Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013). Aside from the ALJ's erroneous, brief mention of bicycle riding as a daily activity, he

gave sufficient reasons supported by the record for finding Plaintiff's subjective symptoms not entirely consistent with the record. *See Joyce C. v. Kijakazi*, No. 19 CV 8514, 2021 WL 4264274, at *9 (N.D. Ill. Sept. 20, 2021) ("Even a flawed symptom assessment may survive remand, however, where the ALJ reasonably evaluated [the claimant's] symptoms by considering the requisite factors.") (internal quotation marks omitted). Even if Plaintiff contends that the evidence should have been weighed differently in the first instance, the ALJ's analysis was not "patently wrong," and thus the Court cannot disturb the ALJ's finding. *Summers*, 864 F.3d at 528.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [dkt. 17] is denied, and the Commissioner's cross-motion for summary judgment [dkt. 20] is granted. The Court affirms the Commissioner's final decision.

**SO ORDERED.**

Date: 3/15/23

_____
BETH W. JANTZ
United States Magistrate Judge